IN THE SUPREME COURT OF TEXAS

 

════════════

No. 03-0396

════════════

 

CenterPoint Energy, Inc.
f/k/a Reliant Energy, Incorporated

and American Electric Power
Company, Inc., Petitioners

 

v.

 

Public Utility Commission of Texas, Respondent

 

════════════════════════════════════════════════════

On Petition for Review from the

Court of Appeals for the Third District of Texas

════════════════════════════════════════════════════

 

Argued
February 18, 2004

 

Justice
Owen delivered the opinion of the Court, in which Justice Hecht, Justice O=Neill, Justice Jefferson and Justice
Wainwright joined.

 

Justice Brister filed
a dissenting opinion, in which Chief
Justice Phillips, Justice
Schneider and Justice Smith joined.

 

We deny the motion for rehearing. 
We withdraw our opinion of June 18, 2004 and substitute the following in its place.

 

In a regulated environment, electric utility
companies made very large expenditures to build generation plants, some of
which were nuclear power plants.  Under
regulation, those utilities and their shareholders were entitled to, and had, a
reasonable opportunity to recover through rates not only their reasonable and
prudent investments of capital in those plants, but also a reasonable,
regulated return on those investments.[1]  In 1999, the Texas Legislature decided that
it was in the public interest to partially deregulate the electric power
industry.[2]  The Legislature recognized that in
fundamentally changing the industry, it was altering the assumptions that had
led utilities to invest large sums in power generation assets.  The Legislature understood that the cost of
these assets likely would be recovered in a regulated environment, but might
well become uneconomic and thus unrecoverable in a competitive, deregulated
electric power market.  The Legislature
called such uneconomic assets stranded costs.[3]  The term Astranded
costs@ has a
specific definition in the Public Utility Regulatory Act (APURA@
or Athe Act@),[4]
but generally speaking, it is the extent to which the book value of generation-related
assets and purchased power contracts exceeds their market value.[5]

The Legislature concluded that if generating
plants became uneconomic as a result of legislatively mandated deregulation, it
was in the public interest for utilities to be made whole by recovering their
full investment in those generation plants, although the utilities would no
longer receive a return on those investments.[6]  The Legislature determined that utilities
should not be required to forfeit their investments in generating plants with
the advent of deregulation.  The
Legislature thus said in the PURA that if there are stranded costs, an electric
utility Ais
allowed to recover all of its net, verifiable, nonmitigable
stranded costs incurred in purchasing power and providing electric generation
service.@[7]  The Legislature set forth a comprehensive
scheme for estimating, finalizing, and recovering those costs.[8]  Stranded cost recovery, if any, will occur
over a period of years rather than in a lump sum.[9]  No one disputes that the Legislature intended
electric utilities to recover carrying costs on stranded costs to compensate
for the financing costs incurred during the stranded cost recovery period.  Nor does anyone dispute that prior to deregulation,
carrying costs on investments in generation plants were included in rates.  The only issue before us is the date from
which carrying costs may be recovered once deregulation commenced:  January 1, 2002, which was the first day of
deregulation, or two or more years later, at the end of final true-up
proceedings.

In a rulemaking proceeding, the Texas Public
Utility Commission determined that carrying costs on a true-up balance must be
calculated from the later date, the date of a true-up final order (sometime
after January 10, 2004).[10]  CenterPoint Energy,
Inc. (formerly known as Reliant Energy, Inc.) and American Electric Power
Company, Inc. (AAEP,@ a public utility holding company whose
Texas operating company was formerly known as Central Power and Light Company)
contend that this rule is invalid, arguing that carrying costs should be
recovered from the date that regulated rates ended and competition commenced,
which was January 1, 2002.  The court of appeals rejected the generation
companies=
arguments and upheld Rule 25.263(l)(3).[11]

The court of appeals also rejected a related
challenge to Rule 25.263(l)(3).  In
separate proceedings not before us, the Commission directed CenterPoint
and AEP to reverse early efforts to mitigate
potential stranded costs.[12]  If it is ultimately determined in an appeal
from those proceedings that the generation companies have stranded costs and
the Commission erred by reversing early mitigation efforts, the generation
companies argue that Rule 25.263(l)(3) does not permit them to recover interest
for the period of time that amounts associated with early mitigation efforts
were incorrectly refunded to customers.[13]  The court of appeals in this case held that Aa utility=s
right to fully recover its stranded costs does not encompass a right to early
mitigation.@[14]
 The generation companies take issue with
this determination, but advise us that the matter would be moot if this Court
concludes that they are entitled to carrying costs on stranded costs from January 1, 2002.

We hold that Rule 25.263(l)(3) is inconsistent
with the Legislature=s
intent, expressed in Chapter 39 of the PURA, that utilities fully recover their
Anet, verifiable, nonmitigable
stranded costs incurred in purchasing power and providing electric generation
service,@[15]
that Aexist on
the last day of the freeze period [December 31, 2001].@[16]  A two- or three-year gap in recovery of
carrying costs would not permit generation companies full recovery of their
stranded costs as the Legislature envisioned. 
However, the capacity auction true-up procedure set forth in the Act[17]
may include a component for return of or on stranded costs in 2002 and 2003, a
determination that cannot be made from the record in this rulemaking
proceeding.  The amount of stranded cost
recovery, if any, through capacity auction true-ups will have to be considered
in determining the amount of carrying costs on stranded costs from January 1, 2002 to ensure
that there is no overrecovery of stranded costs.[18]  We accordingly remand this issue to the
Commission for further consideration of whether to address carrying costs in a
rule or in contested case hearings applicable to each electric utility and its
affiliates.

Because Rule 25.263(l)(3) is invalid and we are
remanding this matter to the Commission, we do not address whether or under
what circumstances generation companies might be entitled to interest on
refunds of early mitigation credits if those refunds were to be reversed.

I

We first consider the standard of
review.  The Commission=s order adopting Rule 25.263[19]
reflects that the rule was promulgated under section 14.002 of the Act, which
provides:  AThe
Commission shall adopt and enforce rules reasonably required in the exercise of
its powers and jurisdiction.@[20]  The order also cites sections 39.252 and
39.262 of the PURA, which the Commission said Aaddress[]
a utility=s right
to recover stranded costs@
and Arequire
the commission to conduct a true-up proceeding for each . . . utility
after the introduction of customer choice.@[21]

Section 39.001 of the PURA has separate provisions
governing review of the validity of a competition rule.  Section 39.001 provides that A[j]udicial
review of competition rules adopted by the commission shall be conducted under
Chapter 2001, Government Code, except as otherwise provided by this chapter
[39].@[22]  Section 39.001 provides for a direct appeal
to the Third Court of Appeals for A[j]udicial review of the validity of competition rules,@[23]
and for expedited procedures in such an appeal.[24]  The Commission=s
order does not contain a reference to section 39.001.

CenterPoint and AEP
nevertheless filed a direct appeal in the Third Court of Appeals, and the court
of appeals= opinion
recites that the court had before it a direct appeal under subsections
39.001(e) and (f) of the Act.[25]  No one has taken issue with the
characterization of Rule 25.263 as a Acompetition
rule@ or the
applicability of subsections 39.001(e) and (f). 
Regardless of whether those subsections apply, the validity of Rule
25.263(l)(3) is at issue, and under our case law,[26]
the rule is invalid if, among other things, it violates a statutory
provision.  We turn to an analysis of
Rule 25.263(l)(3) with these considerations in mind.

II

This is the fourth case in which we have addressed
issues arising out of the partial deregulation of the electric power industry,
including issues concerning stranded costs.[27]  Stranded costs include regulatory assets,[28]
which are essentially bookkeeping entries that reflect a charge that was to be
included in a utility=s
future rates in a regulated environment.[29]  Stranded costs also include the reasonable
excess cost above the market value of assets such as generating plants,
including nuclear power plants.[30]  As we have previously explained, under the
regulatory scheme that existed before 1999, an electric utility had an
opportunity to recover prudent capital investments in generation assets and a
reasonable return on those investments through rates.[31]  The Act recognizes that, generally, there are
financing or carrying costs associated with generation assets and that these
carrying costs were historically recovered in rates.[32]  Accordingly, under traditional rate
regulation, ratepayers would pay carrying costs as a utility recovered its
investment in generation assets over the useful life of those assets.

The Commission recognizes that if costs are
stranded in a deregulated environment, a generation company is entitled to
recover carrying costs on those stranded costs, which are recovered over time
either through a competition transition charge or securitization.  The dissent does not dispute that the Act
implicitly, if not explicitly, assumes that there will be carrying costs on
stranded costs.  The only issue is
whether the Act contemplates roughly a two-year gap in recovery of carrying
costs between the date regulation ceased (January 1, 2002) and the date of a
final true-up order (2004 or perhaps beyond).

The Commission says such a gap is
permissible.  The Commission determined
in Rule 25.263(l)(3) that carrying costs on stranded costs should be
recovered by electric utilities only from the date of the final true-up order.[33]  Carrying costs are to be calculated based on
each utility=s
individual cost of capital established in that utility=s
unbundled cost of service (UCOS) proceeding.[34]  Final true-up orders will be entered sometime
after January 10, 2004,
which is specified in section 39.262 as the date after which each transmission
and distribution utility, its affiliated retail electric provider, and its
affiliated power generation company must jointly file to finalize stranded
costs.[35]  We must decide whether the Commission=s failure to permit the recovery of
carrying costs for approximately a two-year period after regulated rates ended
and customer choice began violates the Act.

In its order adopting Rule 25.263(l)(3), the
Commission explained why it chose the date of a final true-up order as the date
from which carrying costs should accrue by saying Aa
utility=s true-up
balance becomes due upon the issuance of a final order in that utility=s true-up proceeding.@[36]  In its briefing on appeal, the Commission
elaborated, contending that stranded costs did not come into existence on the
first day of customer choice, but instead will come into existence only after a
true‑up proceeding is concluded. 
The court of appeals agreed with this rationale.[37]  In post-submission briefing in this Court,
the Commission contends that in addition to this logic, disallowing carrying
costs from the date customer choice commenced (January 1, 2002) until the date of a final order sometime
in 2004 or later is justified because otherwise generation companies may
receive a double recovery.  The
Commission contends that the capacity auction true-ups that will be conducted
under section 39.262(d) of the PURA[38]
include a component that will allow generation companies to recover debt
service on their book generation assets in addition to operating costs.  Texas Industrial Energy Consumers (TIEC), an intervenor in the court of appeals and in this Court,
likewise contends that because of the capacity auction true-up, generation
companies would receive a double recovery if they are permitted to receive
carrying costs from the date customer choice began.

The generation companies counter that the date as
of which stranded costs are to be determined is December 31, 2001, as reflected throughout
chapter 39.  The generation companies
also contend that under section 39.262(d), they are entitled to recover the
amount the capacity auction true-up yields, without regard to whether they have
stranded costs.  Capacity auction true-up
proceeds and stranded cost recovery are entirely separate, the generation
companies contend, and there would be no double recovery if carrying costs on
stranded costs are permitted from January 1, 2002.

Because of the complexity of the issues, we think
it helpful to outline our conclusions before examining the Act in greater
detail.  We conclude that the Commission=s construction of chapter 39 was
incorrect regarding the date as of which stranded costs are to be
determined.  Chapter 39 reflects
that the amount of stranded costs, if any, is to be determined as of the day
before competition beganCDecember
31, 2001Cor
earlier in some cases.[39]  However, the Act recognizes that a
determination of whether there were stranded assets as of December 31, 2001, and a meaningful
valuation of those assets as of that date, could not be made until a
deregulated market had a period of time to develop and then to stabilize.  Because the Commission=s
rule is based on an incorrect construction of the Act in this regard, it is
infirm.

That does not mean that generation companies are
entitled to carrying costs on the entire positive balance of stranded costs, if
any, from January 1, 2002.  Based on the record before us, it appears
that the design of the capacity auction true-up may have permitted generation
companies to recover during 2002 and 2003 at least a portion of their fixed
costs, including stranded costs, if any. 
That determination cannot be made from this record.  Preventing an overrecovery
of stranded costs requires a determination, on a company-by-company basis, of
whether proceeds from a capacity auction true-up had a component for return on
or of stranded costs and of the quantity of any such return.  We accordingly remand this proceeding to the
Commission for further consideration.

The dissent asserts that our holding Apotentially@
entitles utilities to Abillions
of dollars in interest.@[40]  As the dissent concedes, however, it is
unknown at this point whether there will be any stranded costs at all and thus
any carrying costs.  If it is determined
that stranded costs did exist on December 31, 2001, the amount of any such costs is
likewise unknown, as is the extent to which stranded cost recovery has or will
occur through a capacity auction true-up. 
This Court must give effect to legislative intent as expressed in the
PURA.  We must ensure that the Commission
implements the statutory scheme set forth in Chapter 39 of the PURA without
regard to speculation about how deregulation may or may not affect market
values of generation assets and thus may or may not affect rates.

The pertinent sections of Chapter 39 and the
record in this case are considered more thoroughly below.

III

The deregulation process has many
components, some of which can be briefly summarized for purposes of this
appeal.  The Legislature determined that
the production and sale of electricity should no longer be regulated in Texas,
except for transmission and distribution services and the recovery of stranded
costs.[41]  The Legislature chose January 1, 2002 as the date on which
customer choice would begin, with a few exceptions not relevant to the issues
in this case.[42]  Correspondingly, December 31, 2001 was the date
traditional regulation of wholesale rates would end.[43]  The Legislature recognized that deregulation
could not be accomplished overnight. 
Accordingly, beginning September
 1, 1999, and continuing until January 1, 2002, the Legislature froze retail electric
rates.[44]  The Legislature also directed that by January 1, 2002, each
electric utility must separate its business activities into a power generation
company, a retail electric provider, and a transmission and distribution
utility.[45]  For a five-year period after the beginning of
customer choice, from January
 1, 2002 until January
 1, 2007, retail electric providers are required to offer
residential and small commercial customers rates that are six percent less than
those in effect on January
 1, 1999, with certain adjustments.[46]  This is the Aprice
to beat@ in the
retail market.[47]

Resolution of the issues raised by Rule 25.263
requires a more detailed focus, however, on provisions of chapter 39 that
govern generation companies and stranded costs.

A

In enacting deregulation legislation, the
Legislature had before it a 1998 report prepared by the Public Utility
Commission that analyzed potential stranded costs.[48]  The term AECOM@ was used in that report, meaning
excess costs over market.  That report
identified a number of generation companies that, in a deregulated market, were
projected to have unrecoverable or Astranded@ costs, principally nuclear power plant
investments.  The Legislature required
electric utilities identified in this 1998 report as having projected stranded
costs to use Aa number
of tools . . . to mitigate stranded costs@
by Areduc[ing] the net book value of, otherwise referred to as >accelerat[ing]=
the cost of recovery of, its stranded costs@
before customer choice began on January 1, 2002.[49]  For each of the three years preceding customer
choice (1999, 2000, and 2001), electric utilities were required to file annual
reports showing whether they had excess earnings from charging frozen rates,[50]
and if so, to apply those excess earnings to reduce the book value of
potentially stranded investments.[51]  During the period leading up to customer
choice, before utilities were unbundled, utilities also had the option of
redirecting depreciation expense relating to transmission and distribution
assets to generation assets as another tool for reducing the book value of
potentially stranded assets.[52]

The Legislature recognized that these early
mitigation efforts might not be sufficient to eliminate stranded costs.  In the period leading up to customer choice
on January 1, 2002,
the Legislature gave electric utilities another option.  At any time after September 1, 1999 (the start of the
retail rate-freeze period), a utility was permitted to securitize 100 percent
of its regulatory assets[53]
and up to 75 percent of its other estimated stranded costs.[54]
 This meant that a generation company
could begin to recover stranded costs even before January 1, 2002, and before the final dollar
amount of those stranded costs, if any, could be quantified.

The only explicit reference to carrying costs on
stranded costs appears in a section of the Act regarding securitization.[55]  The securitization provisions reflect that
the Legislature implicitly, if not explicitly, assumed that carrying costs on
stranded costs are to be borne by ratepayers over the entire life of the generating
assets under either conventional financing methods or securitization.[56]  Section 39.301 sets forth the purposes of
allowing securitization.  Securitization
is intended to Alower the
carrying costs of the assets relative to the costs that would be incurred using
conventional utility financing methods.@[57]  The Acosts
that would be incurred using conventional utility financing methods@ are the carrying costs on generation
assets that customers would otherwise pay to the generation company.  The Legislature commanded the Commission to Aensure that securitization provides
tangible and quantifiable benefits to ratepayers, greater than would have been
achieved absent the issuance of transition bonds.@[58]  In this same vein, the Legislature said that
the Commission could permit securitization only if it found Athat the total amount of revenues to be
collected under the financing order is less than the revenue requirement that
would be recovered over the remaining life of the stranded costs using
conventional financing methods.@[59]  Securitization could occur under the statute,
and did occur (at least for regulatory assets),[60]
prior to January 1, 2002.[61]  When securitization is used, carrying costs
on stranded costs are recovered from the date of securitization forward.[62]  There is no two-year gap in payment of
carrying costs for 2002 and 2003.

In making the determination of whether
securitization benefitted ratepayers, the Legislature
directed the Commission to look at the entire remaining life of stranded costs,
beginning as early as September
 2, 1999.[63]  There is no suggestion that in making that
calculation, the Commission could drop out the carrying costs for the two-year
period between the onset of customer choice (January 1, 2002), and the
date a final true-up order could be entered (2004 or beyond).  If stranded costs never come into existence
until 2004, as the Commission argues, then the Legislature=s securitization scheme compared apples
to oranges and allowed securitization to proceed using a much less stringent
test from the ratepayers=
perspective.  That is not a reasonable
construction of the Act.

B

For estimated stranded costs that
had not been mitigated or had not been or could not be securitized, the
Legislature provided that those costs should be recovered through competition
transition charges starting on the first day of competition, January 1,
2002.  The Legislature directed in
section 39.201 that between April 1, 2000 and January 1, 2002 the Commission
was to determine any expected competition transition charge and make it
effective on January 1, 2002.[64]  The actual dollar amount of stranded costs
could not be known at the time those charges were to be determined, so in
section 39.201, the Legislature directed the Commission to calculate
competition transition charges using the ECOM administrative model in the
Commission=s 1998
Report, but using updated, company-specific inputs and market-based natural gas
forward prices, in addition to other specified updates.[65]

It is highly significant to the question before us
today that the Legislature said in section 39.201 that the pertinent date for
quantifying stranded costs was December 31, 2001, Athe
last day of the freeze period@
and the last day before customer choice began on January 1, 2002.[66]  In implementing competition transition
charges, the Commission was directed to calculate Athe
amount of stranded costs as defined in Subchapter F that are reasonably
predicted to exist on the last day of the freeze period [December 31, 2001].@ 
Accordingly, the Commission was told that sometime between April 1, 2000
and January 1, 2002, it was to estimate Athe
amount of stranded costs as defined in Subchapter F that are reasonably
projected to exist on the last day of the freeze period [December 31, 2001]@ and to put nonbypassable
rates in effect on January 1, 2002 to begin recovery of these amounts.[67]  The Legislature did not tell the
Commission to estimate the amount of stranded costs that were projected to
exist as of a date in 2004, or at the end of a true-up proceeding, which would
have been appropriate dates if the Commission=s
interpretation of the Act were correct. 
Instead, the Legislature directed the Commission to permit generation
companies to begin recovery of stranded costs on January 1, 2002, through competition
transition charges, if they were projected to have stranded costs as of
December 31, 2001. 

C

The Legislature=s use of the words Aremaining stranded costs@ in section 39.201(l) is also
significant.[68]  That section provides that, A[t]wo years after
customer choice is introduced [meaning two years after January 1, 2002],@ the Commission is to determine in
final true-up proceedings whether there are any Aremaining
stranded costs.@[69]  This indicates that the Legislature thought
that stranded costs would have been in existence before the final true-up and
only remaining stranded costs would be recovered going forward.  If, as the Commission contends, stranded
costs could not come into existence until after the true-up proceedings were
concluded, then the Legislature would not have referred to Aremaining stranded costs@ that are to be quantified during the
final true-up.  The Commission=s position is contrary to the
Legislature=s
directive that the 2001 Astranded
cost estimate@ must Abe reviewed and, if necessary, adjusted
to reflect a final, actual valuation in the true-up proceeding.@ 
The 2001 projection of what stranded costs would exist as of December
31, 2001 was to be reviewed and adjusted.

D

As it turned out, the calculations
made by the Commission in 2001 using the ECOM model showed that no generation
company was projected to have stranded costs as of December 31, 2001.  Accordingly, no competition transition
charges were implemented for any generation company.  That fact seems to have obscured the
Commission=s view of
the date as of which section 39.201 says stranded costs are to be
measured.  Rule 25.263(l)(3) is contrary
to what the Legislature contemplated could happen under section 39.201.  If stranded costs had been projected in 2001
to exist on December 31, 2001 for a generation company, then that company was
entitled to begin collecting stranded costs.[70]  Of course, the stranded costs would not have
been collected in a lump sum.  The
Legislature gave the Commission factors to consider in deciding Athe length of time over which stranded
costs@ may be
recovered through competition transition charges.[71]  No one, including the dissent, disputes that
there would have been a component for recovering carrying costs in competition
transition charges.

If company A had been projected in 2001 to have
$5,000,000 in stranded costs, A would have begun recovering $5,000,000 plus
carrying costs through a competition transition charge from January 1, 2002
over a number of years.[72]  If the 2004 true-up confirmed that the 2001
projection was an accurate predictor of the amount of stranded costs, A would
continue to receive the competition transition charge.  The net result would be that A recovers
carrying costs on stranded costs from January 1, 2002.

But, as has happened, assume that A was projected
in 2001 to have no stranded costs and therefore did not receive a competition
transition charge in 2002 and 2003. 
Further assume that in a 2004 true-up proceeding, it is determined that
A has stranded costs of $5,000,000.  The
Commission says that A could begin recovering $5,000,000 plus carrying costs
from 2004 over a period of years.  The
net result would be that A recovered carrying costs only from 2004.

We must ask, why would the Legislature, planning
in 1999 for various contingencies, have intended for company A to recover two
years of carrying costs if the 2001 projection turned out to be an accurate
predictor of actual stranded costs, but not if the 2001 projection was not an
accurate predictor of actual stranded costs? 
It is extremely unlikely this was the Legislature=s
intent, particularly when it is undisputed that if the 2001 projection overestimated
rather than underestimated stranded costs, overrecovery
dating back to January 1, 2002 would be reversed.[73]  It seems more likely that the Legislature
intended for its scheme to be symmetricalCrequiring
adjustments for both overrecovery and underrecovery if the 2001 projection was not an accurate
predictorCrather
than arbitraryCallowing
adjustments only for overrecovery.  The Act unquestionably provides that if the
2001 projection proved to have overestimated stranded costs when the true-up
was conducted in 2004, then that overrecovery would
be rectified through 1) a reduction in the competition transition charge,
to the extent it had not been securitized, 2) a reversal, in whole or in
part, of depreciation expense redirected under section 39.256, 3) a
reduction in the transmission and distribution utility=s
rates, or 4) a combination of these measures.[74]

If the Commission and TIEC were correct that no
stranded costs could come into existence until the end of a true-up proceeding,
which would be sometime in 2004 or perhaps beyond, then a generation company
that collected competition transition charges under section 39.201 would be
required under the rationale of Rule 25.263(l) to refund all carrying costs
collected as part of those charges between January 1, 2002 and a final true-up
order.  Nothing in chapter 39 suggests
such a result.  For example, suppose that
the 2001 ECOM model calculations made pursuant to section 39.201 had projected
that a generation company=s
stranded costs as of December 31, 2001 were $5,000,000, and that company began
collecting competition transition charges over a fifteen-year period to recover
that amount.  Additionally assume that in
2004, the final true-up showed that the company=s
stranded costs were $5,000,000, and that $1,000,000 of those costs had been
recovered through competition transition charges.  Applying the Commission=s reasoning, the generation company
would have to refund the carrying cost component in the transition charges
collected from 2002 until 2004.  Indeed,
applying the Commission=s
reasoning, the company would have to refund interest on the carrying costs to
make up for the time value of the carrying costs that the company collected
before 2004.

The Commission=s
contentions in this appeal regarding carrying costs are inconsistent with its
own rule.  Rule 25.263(g)(2)(A)
recognizes that under the example in the paragraph above, a company that began
collecting carrying costs in 2002 as part of a competition transition charge
would keep those carrying costs if, in a 2004 true-up proceeding, it is found
to have stranded costs.  Rule 25.263(g)(2)(A)
provides that in a final true-up, any generation-related invested capital
recoverable through a competition transition charge, exclusive of carrying
costs, projected to be collected through the date of the final order in the
true-up proceeding, is to be deducted from the December 31, 2001 book value of
generating assets.[75]

The Commission=s
rule creates an anomaly.  Whether
carrying charges can be collected from January 1, 2002 depends entirely on
whether the 2001 ECOM model projected stranded costs.  If the model did, then unquestionably,
section 39.201 required the Commission to put into effect competition
transition charges through which generation companies would begin recovering
stranded costs and carrying costs on those stranded costs.[76]  If the ECOM model projected no stranded costs,
but in 2004, market valuations reveal that the 2001 ECOM projection was not a
good predictor of actual stranded costs, then the Commission=s rule does not permit carrying
costs.  Carrying cost recovery under the
Commission=s rule can
turn entirely on the accuracy of the 2001 ECOM projections.  This is not a reasonable construction of
sections 39.201 and 39.262.

E

Other parts of section 39.201 indicate that the
Legislature considered December 31, 2001 to be the date as of which stranded
costs would finally be calculated in a true-up proceeding.  Subsection 39.201(l) says:  ATwo
years after customer choice is introduced [which would be 2004], the stranded
cost estimate under this section shall be reviewed and, if necessary, adjusted
to reflect a final, actual valuation in the true-up proceeding under Section
39.262.@[77]  A[T]he
stranded cost estimate@
in subsection (l) refers back to the estimate performed under subsection
(h) that was to apply the ECOM model with updated inputs in order to calculate Athe amount of stranded costs as defined
in Subchapter F that are reasonably projected to exist on the last day of
the freeze period@
as required by subsection (g).[78]  If stranded costs did not and could not exist
as of December 31, 2001, as the Commission and TIEC contend, then why did the
Legislature direct that the estimate of stranded costs as of December
31, 2001 be adjusted?  If the
Legislature had meant to substitute a calculation of stranded costs as of a
date in 2004, it would have said so.  It
did not.  Even for final true-up
purposes, section 39.201 refers back to stranded costs projected to exist as
of December 31, 2001.[79]

Section 39.262 sets forth in greater detail how
the final true-up proceedings are to be conducted in 2004.  Section 39.262(c) refers to Afinaliz[ing]@
Athe estimated stranded costs used to
develop the competition transition charge in the proceeding held under Section
39.201.@[80]  Here again, the Legislature is directing that
the 2001 estimates used to calculate stranded costs Aprojected
to exist on the last day of the freeze period [December 31, 2001]@ be finalized.[81]  The Legislature is directing that a final
determination be made of the stranded costs that existed on the last day of
the freeze period.  It did not direct
the Commission to determine stranded costs that exist Aon
the first day a final true-up order is issued.@

F

The
reference in section 39.201(g) to the definition of stranded costs in
Subchapter F leads to another reference to the December 31, 2001 date.  Stranded costs are defined in Subchapter F as
follows:

 

AStranded cost@
means the positive excess of the net book value of generation assets over the
market value of the assets, taking into account all of the electric utility=s generation assets, any above market
purchased power costs, and any deferred debit related to a utility=s discontinuance of the application of
Statement of Financial Accounting Standards No. 71 (AAccounting
for the Effects of Certain Types of Regulation@)
for generation‑related assets if required by the provisions of this
chapter.  For purposes of Section 39.262
[regarding true-up proceedings], book value shall be established as of December
31, 2001, or the date a market value is established through a market valuation
method under Section 39.262(h), whichever is earlier, and shall include
stranded costs incurred under Section 39.263.[82]

 

The Legislature defined stranded costs by using December 31,
2001, the day before customer choice was to begin, as the benchmark for book
value, or an earlier date if assets were sold or exchanged.[83]

The Commission and TIEC point out that the
definition of stranded costs in section 39.251(7) has two components, book
value as of December 31, 2001, and market value, which may not be determined
for some companies until 2004 or beyond. 
This, they say, is justification for concluding that stranded costs do
not come into existence, and therefore the company has no right to carrying
costs, until the date of a final order in a true-up proceeding.  This reasoning has several flaws.  The first is the wording of the Act itself.

Section 39.251(7) recognizes that stranded costs
may be finally determined even before January 1, 2002, the date that
competition began, and certainly before 2004.[84]  The definition of stranded costs provides
that if, under section 39.262(h), a company sells or exchanges assets to
establish market value before December 31, 2001, then for purposes of a true-up
proceeding (section 39.262), book value shall be established on that earlier
date of sale or exchange.[85]  Accordingly, any Apositive
excess of the net book value of generation assets over the market value of the
assets@[86]
could be known even before January 1, 2002. 
How can it be said that such stranded costs did not come into existence
until 2004 or beyond?

Similarly, a company may have been projected to
have no stranded costs when the Commission performed the ECOM model calculation
in 2001 required by section 39.201.  That
company may sell or exchange assets sometime in 2002 or 2003.  Stranded costs can be finally quantified once
that sale or exchange occurs.  Yet the
Commission says that these stranded costs could not come into existence until
2004 and that the generation company is not entitled to accrue any carrying
charges on these stranded costs until the date the Commission issues a final
order in a true-up proceeding.  Here
again, the statutory language does not support such a result.

G

TIEC and, to some extent, the
Commission argue that because of fluctuations in market prices from December
31, 2001 until the date of final orders in true-up proceedings in 2004,
stranded costs could come in and out of existence.  Therefore, they say, it is reasonable to
choose a date in 2004 rather than December 31, 2001.  This contention ignores the fact that no gain
could be realized from upswings in the market value of generation assets unless
those assets were sold or exchanged. 
Interim market swings therefore have nothing to do with the stranded
cost equation (net book value of generation assets over the market value of the
assets)[87]
unless generation assets are sold or exchanged. 
If they are sold or exchanged, then, as discussed above, the amount of
stranded costs is determinable on the date of sale or exchange, and there is no
justification for deferring the accrual of stranded costs until sometime in
2004 or beyond, at the end of a true-up proceeding.

There is no cause for concern that rises in gas
prices during the interim between January 1, 2002 and December 31, 2003 would
translate into excess profits for power companies, even if their nuclear power
plants operated profitably.  As will be
discussed in more detail in section IV below, the return that a power company
could earn during 2002 and 2003 was predetermined in 2001.  If that predetermined margin is exceeded,
then the excess will be refunded by the power company pursuant to the capacity
auction true-up under section 39.262(d)(2).[88]

H

This Court
did not resolve the issue now before us in In
re TXU.[89]  That case concerned the Commission=s reversal of early mitigation
efforts.  A majority of the Court held
that mandamus relief was unavailable and did not reach the merits of the
controversy.  The dissent in that case
would have reached the merits of whether the Commission had the statutory
authority to reverse early mitigation efforts before a final true-up.  At one juncture, the dissent said, A[t]he Legislature has required early
mitigation of stranded costs not because those costs actually exist now but because
it has been estimated that they will exist after the 2004 true-up and waiting
until then to begin recovery threatens competition.@[90]  Read in context, the dissent was explaining
that Athe
unquestioned fact is that stranded costs cannot be determined with any accuracy
until one knows what the retail price of electricity is in a competitive
market, and no such market exists.@[91]  Neither the Court nor the dissent purported
to decide whether the Commission could require a two or more year gap in
recovery of carrying costs on stranded costs.

I

Importantly, neither the Commission
nor TIEC has offered any rationale to explain why the Legislature chose to use
the book value of generation assets on December 31, 2001 (or even earlier) in
calculating stranded costs if it intended for stranded costs to come into
existence only after a final true-up proceeding in 2004 or beyond.  But conversely, there is a compelling reason
to determine the amount of stranded costs that existed as of December 31, 2001
and yet use the market value in 2002, 2003, or 2004 of the stranded
assets.  That compelling reason is that
the Legislature knew with certainty that there would be no valid market
indicators on December 31, 2001, the day before customer choice began, or for
up to two years thereafter.

The fact that the Legislature permits the actual
market value of assets in 2002, 2003, or 2004,[92]
or 2004 projections of the value of nuclear assets,[93]
to be used to calculate the value of stranded costs that existed as of December
31, 2001 is entirely consistent with the rationale underlying the capacity
auction true-up proceeding,[94]
to which we now turn.

IV

It is no coincidence that the
capacity auction true-up proceeding[95]
covers roughly the same period of time between the start of customer choice,
January 1, 2002, and the date on which generation companies could first file to
finalize stranded costs in a true-up proceeding, which was January 11, 2004.[96]  By definition, stranded costs include
generation assets= excess
book value over market.[97]  The Legislature recognized that on the first
day of deregulation, January 1, 2002, there was no way to validly quantify
stranded costs, if any, because a market for electricity, both wholesale and
retail, would need time to develop, and there would be interim distortions and
fluctuations, perhaps severe ones.  The
Legislature was also concerned that distortions and fluctuations in the market
price of power during the first two years of deregulation could harm consumers
and generation companies alike.  The Legislature
accordingly designed the capacity auction true-up proceeding because of the
likelihood that no stable market would exist until up to two years after the
first day of deregulation.

There are two objectives accomplished by the
capacity auction true-up proceeding that are pertinent to this appeal.  The first is that a generation company is
limited to a set margin that it will receive for sales of power, no matter how
high or how low gas prices and fuel costs might be during 2002 and 2003.  The second is that a generation company is
permitted to earn a return on its generation assets during this period.  What cannot be determined from this record is
how much of that return is a return of or on stranded costs.

Section 39.153 requires a generation company to
auction entitlements to at least 15 percent of its total power generation
capacity, commencing at least 60 days before the beginning of customer choice.[98]  This auction obligation continues until the
earlier of 60 months (five years) after the beginning of customer choice or the
date the Commission determines that 40 percent or more of the electric power
consumed by residential and small commercial customers within the affiliated
transmission and distribution company=s
service area before the onset of customer choice is provided by nonaffiliated
retail electric providers.[99]

At the end of the first two years that this
auction obligation is in effect (essentially 2002 and 2003), as part of the
true-up proceeding in section 39.262,[100]
a determination will be made of the difference between the price of power
obtained through the capacity auctions and the power cost projections that were
employed in the 2001 ECOM model for the years 2002 and 2003 to estimate
stranded costs under section 39.201 (which determined whether there would be
competition transition charges).[101]  This essentially guarantees consumers and
power companies that the power company will receive no more and no less than a
margin predetermined by the Commission in 2001 when the ECOM model was run in compliance
with section 39.201.  The former electric
utility=s fuel
balance determined under section 39.202(c) (which is not at issue in this
appeal) is netted with this margin.[102]  If the sum of these two items shows that the
power company has overrecovered, the transmission and
distribution utility is credited.[103]  If it shows the power company has underrecovered, the transmission and distribution utility
is billed.[104]

The court of appeals held that the Commission
erred by requiring in Rule 25.263 that any amount owed to the power company
resulting from the calculation under subsection 39.262(d) be netted against any
Anegative@
stranded cost calculation.[105]  No one has appealed that ruling.  The generation companies contend, however,
that the court of appeals=
holding forecloses any comparison of the capacity auction true-up to the
stranded cost calculation.  The
Commission and TIEC counter that the margin guaranteed by the capacity auction
true-up was intended by the Legislature to be the only means of recovering any
part of stranded costs between January 1, 2002 and the date of a final order in
a true-up proceeding.  The correct
construction of the Act lies between these two polar positions.

In the rulemaking proceeding that led to the
adoption of Rule 25.263, the power companies, TIEC, and others disputed how the
capacity auction true-up determination should be made.  The same order that decided that carrying
costs on stranded costs should be recoverable only from the date of a final
true-up order also decided how the capacity auction true-up would be
calculated.[106]  The Commission essentially accepted the power
companies= position
regarding the calculation of the capacity auction true-up.[107]  The Commission determined that actually
re-running the ECOM model was not required by section 39.262(d) of the PURA,
but instead, that it was appropriate to use Aaggregated
capacity auction revenues, actual fuel costs, and sales amounts [which] are
compared to data from the ECOM model.@[108]

It is not clear from the Commission=s order in this rulemaking proceeding
precisely what is calculated by the capacity auction true-up, but filings by
the power companies as part of the process do shed some light on the
matter.  Reliant Energy, Inc., now known
as CenterPoint, said in written public comments (part
of the record in this case) that the capacity auction true-up calculation
resulted in a Amargin
predicted to be available to contribute to fixed costs and therefore to reduce
stranded costs.@  Reliant explained in greater detail:

 

For purposes of the true-up, the ECOM model has
two main components: the price of power and the price of fuel.  The difference between those components is
the margin predicted to be available to contribute to fixed costs and therefore
to reduce stranded costs.  Assume, for
example, that the ECOM price of power is $43/mwh, and the ECOM price of gas is
$33/mwh.  The margin that is available to
reduce stranded costs in this example is $10/mwh.

The capacity auction will also yield a price of
power and a price of fuel.  The purpose
of the PURA ' 39.262(d)(2)
true-up is to ensure that the [power generation company] ultimately receives
the same margin from the capacity auction process as the ECOM model
predicted.  The [power generation
company] may recover part of, all of, or more than that ECOM margin through the
bid premiums.  In addition, the [power
generation company] will experience some gain or loss on fuel when the capacity
auction strike prices are compared to the [power generation company=s] actual costs.  The remainder (or overcollection)
of the margin should be recovered from (or paid back to) ratepayers in the
true-up proceeding.  Thus, at the time of
the true-up, the [power generation company] can be made whole by the following
formula:

 

(ECOM
market revenues - ECOM fuel costs) - ((capacity auction price x total busbar sales) - actual fuel costs)

 

Maintaining the assumption that the margin between
the ECOM price of power and the ECOM price of gas is $10/mwh, the [power
generation company] should retain that margin in the capacity auction true-up,
assuming sales remain the same.  For
example, suppose the capacity auction price is composed of a $2/mwh bid premium
and a $33/mwh fuel cost, for a total capacity auction price of $35/mwh.  Assuming that the actual fuel cost is
$33/mwh, the [power generation company] would recover from the entitlement
holder all of its fuel costs and $2/mwh to apply against stranded costs.  But to retain the net margin of $10/mwh in
the ECOM model, the [power generation company] should be allowed to recover
$8/mwh from ratepayers.

 

This method could work to the
benefit of ratepayers as well.  For
example, assume that the capacity auction price was $42/mwh and the price of
gas was $30/mwh.  In that instance, the
[power generation company] would overrecover its
expected margin by $2/mwh and would owe that amount to ratepayers.

The Commission adopted a formula for calculating
the capacity auction true-up amount that is substantially the same as that proposed
by Reliant, except that the Commission limited the true-up to the years 2002
and 2003, omitting any calculation for the months in 2004 before a final
true-up order is issued for each power company. 
No one challenges Rule 25.263 with regard to the capacity auction
true-up calculation.

The capacity auction true-up calculation will be
company-specific, based on a margin developed in each company=s unbundled cost of service (UCOS)
proceeding.[109]  This information appears to be confidential
because of competition concerns.  It is
not part of our record and is not available on the Commission=s website.

What can be gleaned from the record in this
proceeding is that some portion of the margin that results from the capacity auction
true-up may contain a component that allows a return of or on stranded
costs.  The court of appeals held that if
a power company is entitled to bill the transmission and distribution utility
for the amount that netting the final fuel balance and capacity auction true-up
yields, then that amount cannot be netted against a stranded cost calculation
that results in a negative number.[110]  The court of appeals=
determination has not been challenged in this Court and is final.  However, that determination does not
foreclose the Commission from taking into account any return of or on stranded
costs that the margin from the capacity auction true-up contains in determining
the appropriate carrying costs on stranded costs.  Section 39.262, which addresses true-up
proceedings, provides at the outset that A[a]n
electric utility . . . may not be permitted to overrecover
stranded costs through the procedures established by this section or through
the application of the measures provided by the other sections of this chapter.@[111]  In setting a competition transition charge or
allowing securitization of stranded costs at the conclusion of a final true-up
proceeding, the Commission can ensure that there is no overrecovery
of stranded costs or carrying costs on stranded costs if the capacity auction
true-up margin has already provided a return of or on part of those stranded
costs.[112]

TIEC is incorrect when it contends that the margin
yielded in the ECOM model worksheets for each company with regard to the
capacity auction true-up was intended by the Legislature to be the only means
of recovering carrying costs on stranded costs until 2004.  Sections 39.201 and 39.262(d) contemplate
that a company may recover both competition transition charges from
January 1, 2002, as well as the margin contemplated in the capacity
auction true-up.[113]  As recognized by the court of appeals, Athe [L]egislature
chose not to include [the capacity auction true-up amount] in its definition of
stranded costs or to incorporate it into the methods it prescribes for
calculating stranded costs.@[114]  But there may be some overlap of recovery of
carrying costs on stranded costs under these sections.  The extent to which carrying costs on
stranded costs have been recovered in the margin provided by the capacity auction
true-up for 2002 and 2003 remains to be determined.

* * * * *

For the reasons considered above,
we hold that Rule 25.263(l)(3) is invalid, and we remand this proceeding to the
Commission for further consideration.

 

_____________________________________

Priscilla R. Owen

Justice

 

 

OPINION
DELIVERED: 
September 3,
 2004